620 S.E.2d 69

**In the Matter of Newberry County Magistrate Joseph Griffin BECKHAM, Respondent.**

No. 26038.

Supreme Court of South Carolina.

Submitted July 6, 2005.

Decided Sept. 19, 2005.

638

Henry B. Richardson, Jr., Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

W. Chadwick Jenkins, of Newberry, for respondent.

PER CURIAM:

In this judicial disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RJDE, Rule 502, SCACR. In the Agreement, respondent admits misconduct and consents to the imposition of an admo-

nition, public reprimand, or suspension not to exceed ninety (90) days pursuant to Rule 7(b), RJDE, Rule 502, SCACR. We accept the Agreement and suspend respondent for sixty (60) days. The facts as set forth in the Agreement are as follows.

## FACTS

### I.

A defendant was charged with criminal domestic violence (CDV). When the matter came to trial before respondent neither the victim nor the arresting officer were present to offer any testimony against the defendant. The defendant was present but did not plead guilty. Notwithstanding the foregoing, respondent found the defendant guilty of CDV. The only information in support of this finding was the law enforcement incident report.

Thereafter, the defendant's attorney contacted respondent over the telephone. During the *ex parte* conversation, the attorney convinced respondent that he had erroneously found the defendant guilty.

During the telephone conversation, respondent told the attorney that if he filed a motion to reopen the case, he would grant the motion. It appears respondent agreed to grant the motion to reopen without notice or opportunity to be heard being afforded the State or the victim and, for purposes of this Agreement, respondent does not deny these facts. However, respondent represents it is possible he checked with law enforcement to see if the State objected to the reopening or that the attorney told respondent he had talked with law enforcement representatives and they had no objection. The matter was reopened and the defendant was found not guilty.

A representative of the Sheriff's Department signed the *Ishmell*[1] order after respondent told the attorney he would grant the motion to reopen. The *Ishmell* order designates the reason for its issuance as "signed off in error." Respondent now recognizes this was not an accurate statement since he had not found the defendant guilty as the result of clerical error, but as the result of judicial error.

---

1. *See Ishmell v. South Carolina Highway Department,* 264 S.C. 340, 215 S.E.2d 201 (1975).

█ After discussing this matter with ODC and his own attorney, respondent now recognizes he was in error in finding the defendant guilty under the circumstances and, in fact, his actions constituted judicial misconduct, albeit unintentional. Respondent now recognizes and acknowledges that his *ex parte* conversation with the defendant's attorney and, additionally, his ruling on a motion without giving the State an opportunity to be heard constituted misconduct. In mitigation, respondent represents he agreed to reopen the matter as he did because it was so very clear to him that he had committed reversible error in his handling of the matter.

Respondent acknowledges that the inaccurate statement on the *Ishmell* order constitutes judicial misconduct. After discussing this matter with ODC, respondent is now aware that *Ishmell* orders are authorized only under limited circumstances to correct clerical errors and the use of such orders under the circumstances here constituted judicial misconduct.

For quite some time and long prior to respondent's magisterial appointment, it was standard practice in the Newberry County Magistrate's Court for a representative of the Sheriff's Department to appear at bench trials in criminal cases in lieu of the appearance of the arresting officer and/or complaining witness(es). In addition, unless the defendant was represented by counsel, it was standard practice to have the Sheriff's Department representative (who had no first hand knowledge of the case) to testify for the State by reading the information from the incident report. If the defendant was represented by an attorney, the case would be continued until the arresting officer and/or the complaining witness(es) could be present.[2]

Respondent represents he followed the procedure described above as it was used by his predecessors and by current Newberry County magistrates. Respondent correctly asserts that hearsay evidence is not inadmissible *per se*, but is admissible unless an objection is made in a timely fashion. ODC does not dispute this contention.

---

2. The Newberry County Magistrate's Court recognized that, if the defendant was represented by counsel, counsel would likely offer a hearsay objection to the admission of information in the incident report (unless the report was introduced by the officer who prepared the report) and the objection would have to be sustained.

■ After discussing the Newberry County Magistrate Court's procedure and related legal principles with ODC and his own attorney, respondent now recognizes that the Magistrate's Court was, in effect, depriving *pro se* defendants of the constitutionally guaranteed right to confront their accusers. This practice constituted judicial misconduct, albeit unintentional. Respondent warrants that, in the future, he will cease allowing defendants to plead guilty or be convicted solely on the basis of incident reports.

ODC does *not* contend that it is judicial misconduct for a judge to allow hearsay testimony into a proceeding where there is no objection, even in cases where a defendant is *pro se*, but, instead, contends that fundamental principles of jurisprudence require some admissible evidence of the commission of a crime as a prerequisite to proceeding with a criminal case. In addition, ODC contends Magistrate's Court should not accommodate the prosecution and deprive *pro se* defendants of basic constitutional rights.

■ The Court emphasizes that while a criminal defendant may plead guilty without any evidence of his guilt being submitted, a defendant who pleads not guilty cannot be convicted solely on the basis of a police incident report. The burden is on the government to prove a defendant's guilt beyond a reasonable doubt based on competent evidence.

## II.

For many years, respondent had been personal friends with both a law enforcement officer (Officer) and a public official (Official). A vacancy which would constitute a promotion for the Officer became available.

■ The Official, while not formally the promoting authority, had sufficient input in the selection process such that, in all likelihood, his recommendation would be followed. Respondent met with the Official for the purpose of recommending the Officer for the promotion. Respondent admits that, under the circumstances, he improperly lent the prestige of his judicial office for the purpose of benefiting another.

*III.*

It is standard practice in the Newberry County Magistrate's Court system not to have scheduled bond hearings but, instead, to have bond hearings as needed. Instead, a magistrate or magistrate's employee telephones the detention center several times a day to determine if a bond hearing is necessary. If a hearing is necessary, a hearing is held by a magistrate for the entire detention center population awaiting bond hearings. This procedure was being used before respondent's magisterial appointment, is used by the Chief Magistrate, and respondent assumed the procedure met published requirements.

As a result of discussions with ODC, respondent is now aware that the procedure is not in strict compliance with procedures for bond hearings as set out in the Chief Justice's administrative order dated November 28, 2000. The Chief Justice's order requires bond hearings to be *scheduled* at least two times a day. The order is included in the instruction course given to all magistrates by South Carolina Court Administration prior to assuming magisterial duties and a copy is included in the Bench Book provided by South Carolina Court Administration to all magistrates and other summary court judges. Respondent acknowledges that failure to follow a court order constitutes judicial misconduct.

ODC does not contend that the foregoing procedure prejudiced any individual defendants, but only that the procedure does not strictly conform to the Chief Justice's directives. In mitigation, respondent was in a dilemma because the instructions from the chief magistrate were at variance with the provisions of the Chief Justice's order.[3]

*IV.*

Respondent is married to the daughter of William Frank Partridge, Jr. (Father-in-law). Father-in-law is an attorney. His offices are in Newberry and, on occasion, he defends cases in Newberry County Magistrate's Court (but not before re-

---

3. The Chief Justice's Administrative Order provides that a Chief Magistrate may request that the Chief Justice approve a bond hearing schedule which deviates from the twice daily bond hearings required by the order. The Newberry County Magistrate's Office did not have the Chief Justice's approval to deviate from her order.

spondent), prosecutes cases in family court for the Solicitor in Newberry County (thereby representing the State), and serves as a part-time municipal judge. Father-in-law has a son, William Franklin "Troup" Partridge, III (Brother-in-law), who is also an attorney with his principle office in Columbia.

For purposes of this Agreement, the parties believe that Brother-in-law was a friend of Eric Boland. Mr. Boland's son, Matthew Boland (Matthew), received a speeding ticket from South Carolina Highway Patrol Trooper M.K. Horne. Trooper Horne issued a ticket to Matthew alleging he was driving 85 M.P.H. in a 55 M.P.H. zone (a six point violation). Mr. Boland contacted Brother-in-law and Brother-in-law contacted his father, Father-in-law, about representing, assisting, and/or advising Matthew in connection with the ticket.

At a regularly scheduled weekly luncheon between respondent and Father-in-law, Father-in-law told respondent he needed to speak to Trooper Horne about Matthew's ticket and asked respondent to convey that message to Trooper Horne. Thereafter, respondent delivered Father-in-law's message to Trooper Horne during a conversation in respondent's office.

Respondent represents Trooper Horne spontaneously volunteered something to the effect "tell Father-in-law not to worry about it [Matthew's ticket], I'll mark it not guilty." Respondent further represents he did not ask Trooper Horne to provide any assistance to Father-in-law or Brother–in–Law and, instead, only passed on the message that Father-in-law wanted to talk with Trooper Horne about Matthew's ticket. ODC has no basis upon which to contest this representation.

The Chief Magistrate called Matthew's case for trial on the occasion specified on the ticket and contends he found Matthew "guilty" in his absence, notwithstanding that neither Matthew nor Trooper Horne were present.[4] The Chief Magistrate marked the ticket "NRVC" which is a standard notation to indicate the defendant failed to appear or post bond and the administrative process should suspend the defendant's driver's license in accordance with applicable law.

---

4. Presumably, Trooper Horne's response was relayed by someone back to Father-in-law and, eventually, by someone to Matthew because Matthew posted no bond and did not appear at trial on the date specified on the ticket.

At some point, someone checked a box on Matthew's ticket indicating Matthew did appear before the Chief Magistrate when Matthew did not appear in court on the occasion specified. Someone also checked a "not guilty" box on the ticket. "Not guilty" is inconsistent with the NRVC notation made by the Chief Magistrate. The ticket was forwarded to the South Carolina Department of Motor Vehicles (DMV).

DMV sent Matthew an official notice suspending his driver's license for failure to pay the traffic ticket. Thereafter, Mr. Boland contacted Brother-in-law about the matter and, in turn, Brother-in-law contacted respondent. Respondent states that "[Brother-in-law] basically called and said that [Matthew] called him or something of that nature, or his dad. Somebody called him saying that the boy in question had a NRVC Notice on the ticket, which it was found guilty, whatever it was done."

Respondent then asked a magisterial employee to check on the matter. The employee reported to respondent that the charge shown on the computer was "guilty," but the ticket was marked "not guilty." The employee spoke with the Chief Magistrate about the matter and reported back to respondent that the Chief Magistrate "said it was guilty." Respondent reported the foregoing to Brother-in-law.

Subsequently, Brother-in-law approached respondent while respondent was holding night court and requested to see the file on Matthew's ticket. Respondent provided Brother-in-law with copies of information he requested from the Magistrate Court's files concerning the ticket. The information respondent furnished to Brother-in-law were matters of public record.

ODC contends that Brother-in-law then called the Chief Magistrate on the telephone about Matthew's ticket and explained that the ticket was supposed to have been "not guilty" and that it had been sent to DMV due to a clerical error. The Chief Magistrate told Brother-in-law that there was no error, that it was his intention to find Matthew guilty, and that no change could be made concerning the disposition of the ticket.

Brother-in-law then asked Father-in-law to assist Matthew in the matter. Father-in-law prepared an affidavit for Matthew's signature, a motion for an *ex parte* order and *ex parte*

order, and an order and rule to show cause, all styled *"Ex Parte* [Matthew]." Circuit Court Judge Wyatt Saunders signed Father-in-law's orders, including an order that the Chief Magistrate appear before the judge the next business day. Brother-in-law had previously served as a law clerk to Judge Saunders.

Judge Saunders and Brother-in-law have represented to ODC that Brother-in-law happened by the judge's chambers to say "hello" after the orders had been signed and the judge asked Brother-in-law to contact the sheriff to have the orders served upon the Chief Magistrate that evening. Brother-in-law went to Father-in-law's home and telephoned the Newberry County Sheriff in the presence of Father-in-law and requested the orders be served on the Chief Magistrate. A deputy sheriff retrieved the orders from Brother-in-law at Father-in-law's home and served the order on the Chief Magistrate that evening.

ODC further represents that the orders do not have a docket number, that no summons was attached to the orders, that no filing fee was paid to the Clerk of Court, even though they bear a "date time" stamp, that no motion fee was paid, that the Sheriff's Department provided no one with proof of service of the orders, and no fee was paid to the Sheriff's Department for service of the pleadings and order.[5]

The next business day, a hearing was held before Judge Saunders. Mr. Boland, Matthew, and the Chief Magistrate were present. The State had not been served with a copy of the pleadings and was not represented at the hearing. At the hearing, Matthew testified that he ". . . believed for some time that he had been found not guilty" and "was under the impression [he] was found not guilty for sometime." At some point during the proceeding, the Chief Magistrate volunteered he would ". . . help on the ticket. . . ."

Judge Saunders allowed the Chief Magistrate and Matthew to discuss the matter so that, in his words, ". . . toward the end of perhaps using [the Chief Magistrate's] good office to assist you." The Chief Magistrate and Matthew discussed the matter, which resulted in the Chief Magistrate, with the

---

5. Because the matter was criminal in nature, not all of these procedures were required.

consent of a passing Sheriff's Department official, reopening the ticket and accepting bond forfeiture for a two point violation.

ODC's investigations revealed the following:

1. Trooper Horne advised ODC he had intended to cause Matthew's ticket to be marked "not guilty" due to a request from someone, but he could not remember who made that request.

2. Judge Saunders reported the pleadings and orders were on his desk when he arrived at work and he does not know how they came to be placed there. He further stated he did not know how Mr. Boland and Matthew came to be before him to get the pleadings and orders, that he would have held a hearing for any other citizen under like circumstances, and it was only a coincidence his former law clerk appeared in his chambers to be available to assist him in having the pleadings served on the Chief Magistrate that evening.

3. The Newberry County Clerk of Court stated she could not locate the original or any copies of the pleadings in her office and states that, under normal circumstances, her office would not clock copies of legal documents without giving them a docket number and retaining the originals. The originals of the pleadings cannot be located in the Magistrate's Office or anywhere else by ODC.

4. The day after the hearing, Father-in-law appeared before the Chief Magistrate on two other traffic tickets issued to Matthew. The Chief Magistrate reduced one of the tickets to a two point violation and dismissed the other ticket.

Respondent has no direct knowledge of the four above-itemized representations by ODC, but has no basis to contest the validity of the representations. For purposes of this Agreement, these itemizations are treated as the facts.

■ While respondent represents he was only conveying a message from Father-in-law to Trooper Horne about Matthew's ticket, respondent now recognizes that, even if only so doing, the communications to Trooper Horne from respon-

dent's Father-in-law was likely to be interpreted as a request to provide special treatment to Matthew. In so doing, respondent committed judicial misconduct.

In his initial response to the Notice of Full Investigation, respondent stated:

At the request of a citizen who had received a ticket, I reviewed the outcome of the court proceedings for him. In speaking with [a Magistrate Court employee] I realized that the ticket was marked as "Not Guilty" but [the employee] had also sent the ticket in as "NRVC." I notified [the employee] of this apparent computer error immediately. After this discussion with [the employee], I had nothing further to do with this matter. I never told [the employee] that the Attorney General had called and I have never spoken to the Attorney General. The Attorney General's office should have call logs, etc., which would show no such conversation ever took place.

As to the allegations of my speaking with the trooper, I do speak to law enforcement on a regular basis but no improprieties occur in our conversations. I may have spoken to the issuing officer but I *do not recall any specifics of our conversation.* (Emphasis in original).

[The Chief Magistrate] handled all matters concerning this ticket and I did not adjudicate it in any manner. I am unaware of any other matters involving [Matthew] and I *did not know my father in law, as a private attorney, represented [Matthew] until receiving the Notice of Full Investigation in this matter.* (Emphasis in original).

Thereafter, respondent filed a Supplemental Response to the Notice of Full Investigation. In this response, respondent represented:

After careful review and consideration of this matter, I remembered additional details regarding the allegations in Paragraph 14. I would like to amend my response to Paragraph 14 of the Notice as follows:

*[Father-in-law] spoke to me regarding a traffic ticket [Matthew] had received. I indicated that I would convey this information to the Highway Patrolman who issued the ticket and believe that I did so on the court date. Although I am uncertain about the details, I believe that the trooper*

*came into my office and I indicated that [Father-in-law] had spoke (sic) to me about the ticket and the Patrolman volunteered that this would not be a problem and that he would simply "not guilty" the ticket. I assumed that this matter was handled before [the Chief Magistrate], the presiding judge that day.* (Emphasis in original).

■ Respondent acknowledges that his initial response omitted reference to relaying the message from Father-in-law to Trooper Horne. Respondent represents he did not remember that conversation until some time until after filing his initial response to the Notice of Full Investigation and, after he did, he filed the Supplemental Response. ODC has no basis to contest this representation. Respondent concedes that the inconsistencies in these two responses, even if due to faulty memory, constituted judicial misconduct since the initial response contained information respondent now recognizes was inaccurate and incomplete.

## LAW

■ By his misconduct, respondent admits he has violated the following Canons of the Code of Judicial Conduct, Rule 501, SCACR: Canon 1 (judge shall uphold integrity of the judiciary); Canon 1A (judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved); Canon 2 (judge shall avoid impropriety and the appearance of impropriety in all activities); Canon 2A (judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary); Canon 2B (judge shall not lend the prestige of judicial office to advance the private interests of others); Canon 3 (judge shall perform the duties of judicial office impartially and diligently); Canon 3B(2) (judge shall be faithful to the law and maintain professional competence in it); Canon 3B(7) (judge shall not initiate, permit, or consider *ex parte* communications); Canon 3B(8) (judge shall dispose of all judicial matters promptly, efficiently, and fairly); Canon 4 (judge shall conduct his extra-judicial activities to minimize the risk of conflict with judicial obligations); and Canon 4A(3)

(judge shall conduct his extra-judicial activities so as not to interfere with the proper performance of his judicial duties).

By violating the Code of Judicial Conduct, respondent admits he has also violated Rule 7(a)(1) of the Rules for Judicial Disciplinary Enforcement, Rule 502, SCACR. In addition, he admits he violated Rule 7(a)(7), RJDE, by willfully violating a valid court order issued by a court of this state.

## CONCLUSION

■ We find respondent's misconduct warrants a suspension from judicial duties. We therefore accept the Agreement for Discipline by Consent and suspend respondent for sixty (60) days. Respondent's request that the suspension be made retroactive to the date of his interim suspension is denied.[6]

**SUSPENSION.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

---

6. On April 8, 2005, respondent was placed on interim suspension. The interim suspension was based on allegations unrelated to the matters addressed by this opinion. The parties have agreed the Agreement concludes not only the matters addressed in the Agreement, but also the complaint from which the interim suspension arose.